Lee **RATNER** and John Zuro, Individually and d/b/a The Grant Company, Plaintiffs-Appellees,

v.

**SIOUX NATURAL GAS CORP.** and Sioux Pipeline Corp., Defendants-Appellants.

Nos. 82–2309, 84–2383.

United States Court of Appeals, Fifth Circuit.

Sept. 12, 1985.

Rehearing Denied Oct. 10, 1985.

---

**8.**  *Id.* at 433–34.

**9.**  467 So.2d 595 (La.Ct.App.1985).

**10.**  *Id.* at 598.

Butler, Binion, Rice, Cook & Knapp, Hayden Burns, Eliot Shavin, Houston, Tex., for defendants-appellants.

William E. Wright, Peter B. Camp, Houston, Tex., for plaintiffs-appellees.

Before RUBIN, WILLIAMS and DAVIS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

The district court adjudged defendants Elliott H. Powers and J.F. Freel, and defendants-appellants Sioux Natural Gas Corporation (Sioux) and Sioux Pipeline Corporation (Sioux Pipeline) liable, in an amount exceeding $18 million, for the securities and common law fraud that a jury found they practiced upon plaintiffs-appellees Lee Ratner, John Zuro, and the Grant Corporation. Holding that plaintiffs did not "purchase" a security, we reverse the judgment to the extent it imposed liability for securities fraud and render judgment on those claims in favor of appellants. We also hold that insufficient evidence supported at least one of the six theories under which the jury found under a general charge that defendants committed common law fraud. We accordingly remand for a new trial on the common law fraud claim. Other issues we treat as they arise.

I.

The transaction that generated this suit involved some 120,000 mineral leasehold acres of gas-producing property in Central Texas. Ratner and Zuro held the leases through their partnership, the Grant Company (Grant Partnership), and they owned 100% of the working interest in the wells on the property. Production proved unprofitable, however, and in late 1973, the Grant Partnership, Ratner, and Zuro began to negotiate a sale to Powers and Freel, who had invested in Grant's development efforts. The discussions produced a written agreement in November 1974. The contract required Powers and Freel to take over plaintiffs' lease obligations, to dismiss a lawsuit they had brought against plaintiffs, to assume $2.4 million of plaintiffs' indebtedness to others, and to pay plain-

tiffs 25% of the net profits from production after Powers and Freel took $3.5 million off the top. In return for the promises, plaintiffs transferred ownership of the leases and of associated personal property to Sioux, which Powers and Freel had created for purposes of taking title. The agreement conditioned the right of Powers and Freel "to sell, convey, farmout, mortgage, pledge or otherwise deal with any of the Properties" by requiring them to exercise the power "in good faith" and to include the amount they received upon selling any of the properties in calculating plaintiffs' share of net profits. Sioux and Sioux Pipeline, which Sioux later spun off, had no shareholders, officers, or directors other than Powers and Freel.

Performance of the agreement by Powers and Freel disappointed plaintiffs. Although they marketed production and spent about $13 million in drilling new wells, dropped their pending action against plaintiffs, and eventually discharged the $2.4 million in debt, Powers and Freel paid nothing to plaintiffs under the 25% net profits interest. Nor did they render the quarterly accountings that the agreement required them to make. The omission deprived plaintiffs of a basis for determining whether production had reached the dollar amount that would have triggered net profits payments. Whether Powers and Freel ever owed any such payments remains uncertain.

More important, according to plaintiffs, Powers and Freel gave several oral assurances prior to execution of the 1974 agreement but did not fulfill them. Plaintiffs allege that Powers and Freel promised to keep the 120,000 leasehold acres substantially intact, to develop the properties generally in accordance with a pre-existing formula, and to take no more than $2,500 each per month as compensation for managing the properties. Plaintiffs also contend that Powers represented that he had or could get enough money to pay the $2.4 million

debt and to drill new wells. The evidence, plaintiffs argue, showed that Powers did not have sufficient funds available, that he and Freel attempted to dismember the acreage, that they deviated greatly from the development formula, and that they paid themselves monthly management fees vastly in excess of $2,500 each.

Plaintiffs did not learn of the transgressions until after they sued for an accounting in state court. The knowledge they gained, however, led them to believe that Powers and Freel never intended to carry out their written and oral undertakings. In the summer of 1977, counsel for plaintiffs deposed a Mrs. Davis, who served as secretary to Powers and Freel. Her testimony revealed that, shortly after they executed the 1974 agreement, Powers and Freel had contracted to sell 60% of the working interest in the leases free and clear of plaintiffs' 25% net profits interest. According to plaintiffs, the deal violated Powers' and Freel's promise to transfer the leases in good faith and breached their oral promise to maintain the leases generally as a unit. The transaction, plaintiffs urge, demonstrated that Powers and Freel had fraudulently induced plaintiffs into signing the 1974 agreement.

Plaintiffs brought this action on November 25, 1977. The complaint charged Powers, Freel, Sioux, and Sioux Pipeline with violating federal and state securities law [1] and with committing common law fraud. Plaintiffs sought rescission of the 1974 agreement, recovery of the leases, and exemplary damages.

A pre-trial ruling allowed amendment of the complaint to substitute the corporate successor of the Grant Partnership as the real party in interest. Ratner and Zuro had incorporated their partnership and assigned to the corporation any claims they had against defendants before they filed this suit, but on January 11, 1977, the Grant Corporation authorized them to pros-

---

**1.** The complaint alleged violations of § 12(2) of the Securities Act of 1933 (1933 Act), 15 U.S.C. § 77*l*(2) (1982), § 10(b) of the Securities Exchange Act of 1934, *id.* § 78j(b), Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1984), and the Texas Securities Act (TSA), Tex.Rev.Civ.Stat.Ann. art. 581–33 A (2) (Vernon 1964).

ecute any claim it had against defendants. Grant Corporation also ratified Ratner's and Zuro's representation of its interests during the pendency of this action in August 1980.

After a nine-day trial, the jury found defendants guilty of common law fraud and of fraud under section 33 A(2) of the Texas Securities Act (TSA) and section 12(2) of the Securities Act of 1933 (1933 Act). *See* Tex.Rev.Civ.Stat.Ann. art. 581–33 A(2) (Vernon 1964); 15 U.S.C. § 77*l*(2) (1982). The jury awarded plaintiffs $11.9 million in actual damages and $1.1 million in punitive damages. The district court entered judgment upon the jury's findings, holding the defendants jointly and severally liable to the Grant Corporation in the amount of $18,385,307.80, which included $5,385,307.80 in pre-judgment interest. Defendants appealed.

A settlement between plaintiffs and Powers and Freel during the pendency of the appeal prompted us to postpone reaching the merits. The settlement agreement released Powers and Freel from further liability on the judgment, and we accordingly dismissed the appeal as to them. Because the record did not show whether the settlement had satisfied the entire judgment, however, we remanded the case for determination of whether the settlement had mooted the appeal as to Sioux and Sioux Pipeline. *See* 719 F.2d 801 (5th Cir.1983). On remand the district court found that the judgment remained unsatisfied, and we reinstated the appeal. We now reach the merits.

## II.

Ratner, Zuro, and the Grant Corporation (appellees) again assert that post-judgment events have mooted the appeal, but they now allege a different theory. On November 16, 1982, Sioux and Sioux Pipeline (appellants) filed voluntary petitions for reorganization under Chapter 11 of the Bankruptcy Code.[2] The bankruptcy proceedings, appellees contend, leave them no hope of collecting the rest of their judgment, and they argue that the impossibility of recovery moots the appeal. Because the Constitution restricts exercises of the judicial power to "Cases" and "Controversies",[3] appellees conclude, we must dismiss the appeal without disturbing the judgment.

We see no merit in the argument. Difficulties in formulating a remedy in an otherwise living case do not evidence the absence of a case or controversy. *Goosby v. Osser*, 409 U.S. 512, 517 n. 5, 93 S.Ct. 854, 858 n. 5, 35 L.Ed.2d 36 (1973) ("Insofar as the single judge may have rested his finding of the absence of a case or controversy on the alleged difficulty of formulating a remedy, he also erred."); *Consumers Union of the United States v. Consumer Product Safety Commission*, 561 F.2d 349, 354 n. 26 (D.C.Cir.1977) (quoting *Goosby* ). Thus, the mere possibility that a judgment debtor lacks the means to satisfy its monetary liability does not kill the issues in a case. An indigent defendant otherwise could defeat any lawsuit simply by asserting that his poverty moots the claims against him. Because appellees may collect on it, the judgment "continues to have an impact on the parties such that the case

---

**2.** 11 U.S.C. §§ 101–151326 (1982). Appellants filed their petitions in the Bankruptcy Court for the Southern District of Texas. *In re Sioux Natural Gas Corp.*, No. 82–03640–H1–5; *In re Sioux Pipeline Co.*, No. 82–03642–H1–5. The bankruptcy proceedings also involve appellants' corporate parent, Rapada Corporation, and their corporate siblings. *In re Rapada Corp.*, No. 82–03638–H2–5; *In re Rapada Energy, Inc.*, 82–03639–H1–5; *In re Ocean Minerals, Inc.*, No. 82–03643–H2–5.

On January 13, 1983, the bankruptcy court modified the automatic stay that 11 U.S.C. § 362 (1982) mandates to permit this appeal "to proceed to conclusion". We think the order broad

enough to authorize us to decide the case despite our previous remand. The lifting of the stay thus gives us jurisdiction over the case. *See In re Louisiana Ship Management*, 761 F.2d 1025, 1026 (5th Cir.1985) (per curiam) (holding that failure to obtain modification of automatic stay deprived admiralty court of jurisdiction over bankruptcy debtor's property).

**3.** U.S. Const. art. III, § 2; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937) ("The Constitution (article 3, § 2) limits the exercise of the judicial power to 'cases' and 'controversies.' ").

remains alive." *Firefighters Local Union No. 1784 v. Stotts,* —— U.S. ——, ——, 104 S.Ct. 2576, 2583, 81 L.Ed.2d 483 (1984). As a matter of law, therefore, the possibility that bankruptcy proceedings will result in a reorganization plan that frustrates appellees' efforts to recover from appellants does not render the case moot.[4]

■ A finding of mootness would not, in any event, entitle appellees to the relief they apparently want. The mooting of a case pending on appeal does not herald apotheosis of the judgment. On the contrary, to avoid the likelihood that someone will invoke the *res judicata* or other precedential effect that the judgment would otherwise have, we generally direct the district court to dismiss the suit. *E.g., United States v. Munsingwear, Inc.,* 340 U.S. 36, 39–40, 71 S.Ct. 104, 106–07, 95 L.Ed. 36 (1950); *United States v. Sarmiento-Rozo,* 592 F.2d 1318, 1321 (5th Cir.1979) (following *Munsingwear*); *see, e.g., Iron Arrow Honor Society v. Heckler,* 464 U.S. 67, ——, 104 S.Ct. 373, 376, 78 L.Ed.2d 58 (1983) (per curiam) (remanding to court of appeals "for entry of an appropriate order

directing the District Court to dismiss the action as moot"). Our determination that the case remains vital, of course, obviates dismissal, and we turn to the viability of the judgment.

### III.

Appellants first attack the judgment on the ground that appellees did not "purchase" a security within the meaning of section 33 A(2) of the TSA and section 12(2) of the 1933 Act. We think the argument sound.

■ Sections 33 A(2) and 12(2) by their terms impose liability on any person who "offers or sells" a security by fraudulent means, but their protection extends only to purchasers.[5] Persons who did not buy the security thus lack standing to sue the person who offered or sold it. *E.g., Gutter v. Merrill Lynch, Pierce, Fenner & Smith,* 644 F.2d 1194, 1196 (6th Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1256, 71 L.Ed.2d 447 (1982); *Bosse v. Crowell, Collier and Macmillan,* 565 F.2d 602, 610 n. 12 (9th Cir.1977); *cf. Rathborne v. Rathborne,* 683 F.2d 914, 918 (5th Cir.1982)

---

4. Given that the bankruptcy court has not confirmed a plan of reorganization, we pretermit the separate question of whether discharge of a judgment debtor from bankruptcy moots the judgment creditor's claims. *See In re Sun Country Development,* 764 F.2d 406, 407–08 n. 1 (5th Cir.1985) ("To dismiss the appeal on the basis of mootness, we must find that the plan [of reorganization] has been so substantially consummated that effective judicial relief is no longer available to Brite.").

5. As of 1974, when the events at issue in this case happened, section 33 A(2) provided in relevant part:

A. Any person who

\* \* \* \* \* \*

(2) Offers or sells a security (whether or not the security or transaction is exempt under Section 5 or 6 of this Act) by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made not misleading (when the person buying the security does not know of the untruth or omission, and who in the exercise of reasonable care could not have known of the untruth or omission) is liable to the *person buying the security from him* ....

Tex.Rev.Civ.Stat.Ann. art. 581–33 A(2) (Vernon 1964) (emphasis supplied). Although in 1977 the Texas legislature expanded section 33 to

protect sellers as well as buyers, the new provisions do not apply to cases involving only pre-1977 transactions. *See* 1977 Tex.Gen.Laws ch. 170, § 2 (prescribing effective date of amendments).

The pertinent part of section 12 provides: Any person who—

\* \* \* \* \* \*

(2) offers or sells a security (whether or not exempted by the provisions of section 77c of this title, other than paragraph (2) of subsection (a) of said section), by the use of any means or instruments of transportation or communication in interstate commerce or of the mails, by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission,

shall be liable to the *person purchasing such security* from him....

15 U.S.C. § 77*l*(2) (1982) (emphasis supplied).

(holding that "a private party does not have standing to recover under Rule 10b–5 unless the plaintiff can allege and ultimately establish that he himself was a purchaser or seller"). If appellees did not purchase a security from appellants, therefore, they had no standing under the securities laws, and we must reverse the judgment of liability for securities fraud.

■ We believe it manifest that appellees bought no security. Appellees claim that their 25% net profits interest constituted the security in this case[6] and that they "purchased" it when they executed the 1974 agreement. They do not dispute (and the evidence conclusively showed), however, that they owned all the working interest in the Grant properties before they entered into the agreement. Their pre-agreement interest in the properties they conveyed to appellants thus entitled them to 100% of the profits from production, subject only to existing royalty interests. Rather than buying the net profits interest, therefore, appellees did no more than retain a portion of their rights as working interest owners. Because they could not buy what they already owned, appellees lacked standing to sue under sections 33 A(2) and 12(2). We accordingly reverse the judgment insofar as it rested on a finding that appellants violated state and federal securities law and render judgment that appellees take nothing on their securities fraud claims.[7]

## IV.

■ We next consider whether the record supports the jury's findings that appellants committed common law fraud and that appellees sustained $11.9 million in actual damages.[8] Our review of the evidence convinces us that appellees failed to prove at least one of the six fraud theories that the district court submitted to the jury under a general charge. Because the court did not ask the jury to answer special interrogatories corresponding to each theory, we cannot determine which theory or theories succeeded. The general verdict thus may rest upon a theory that lacks adequate support in the record, and we must set it entirely aside. *See, e.g., Mozingo v. Correct Manufacturing,* 752 F.2d 168, 176 (5th Cir.1985); *Jones v. Miles,* 656 F.2d 103, 106 & nn. 3–4 (5th Cir.1981); *Smith v. Southern Airways,* 556 F.2d 1347, 1347 (5th Cir.1977); *see generally Moses v. Marathon Oil,* 749 F.2d 262, 263 n. 3 (5th Cir.1985) (noting that "[w]e have repeatedly urged the use of special interrogatories").

The frailty of a general verdict does not absolve us from upholding it if possible. Cases that justify disregarding the jury's determinations seldom arrive in this Court. "We decide only if reasonable jurors could agree with this verdict." *Texoma Ag-Products v. Hartford Accident & Indemnity,* 755 F.2d 445, 448 (5th Cir.1985); *see, e.g., Boeing Co. v. Shipman,* 411 F.2d 365 (5th Cir.1969) (en banc).

At the trial, appellees sought to prove fraud by presenting evidence that appellants had fraudulently induced them into selling the Grant properties by making six misrepresentations:

(1) that Defendants would keep the Grant properties intact for development purposes;

(2) that profits would be shared with Plaintiffs in accordance with the defined Net Profits Interest;

(3) that the drilling development on the Grant properties would follow the

---

**6.** Appellees claimed that the net profits interest constituted a "certificate in or under a profit sharing or participation agreement" or an "investment contract" under the TSA. *See* Tex.Rev.Civ.Stat.Ann. art. 581–4 A (Vernon 1964). They also alleged that their interest fell within the 1933 Act definition of security as a "certificate of interest or participation in any profit-sharing agreement" or an "investment contract". *See* 15 U.S.C. § 77b(1) (1982).

**7.** We pretermit the question of whether a net profits interest of the type claimed in this case constitutes a "security".

**8.** We do not reach the merits of appellants' separate assault on the sufficiency of the evidence to support the findings of securities fraud liability and damages. Our determination that appellees lacked standing to bring securities fraud claims makes decision of the questions unnecessary.

same formula as that previously used in the B.C. Development drilling programs, in which the participators would retain a twenty-five percent (25%) working interest after payout;

(4) that Defendants Powers and Freel would take out only $2500 per month as compensation until the Grant properties' debts were paid out and profits could then be shared with Plaintiffs;

(5) that the Defendant had available all the funds necessary for financing future drilling on the properties; and

(6) that the Defendants would exercise good faith in any transfer of the Grant properties.

The district court charged the jury that it could hold appellants liable if it found that any one of the misrepresentations satisfied the elements of common law fraud.

■ The record shows that appellees failed to prove injury from the first misrepresentation. To prevail on a common law fraud claim in Texas, one must show that a misrepresentation caused him injury. *E.g., South Hampton Co. v. Stinnes Corp.*, 733 F.2d 1108, 1120 (5th Cir.1984) (applying Texas law); *Stone v. Lawyers Title Insurance*, 554 S.W.2d 183, 185 (Tex.1977). Appellees produced evidence that appellants sold 60% of the working interest in the Grant properties to a third party shortly after receiving the properties from appellees. They also elicited testimony that the transaction "took away 60 percent of the potential revenues that could have been to the benefit of [appellees'] net profits interest." As appellants point out, however, the sale soon fell through when the third party rescinded it. Thus, the record contains no evidence that appellees suffered injury by virtue of the abortive dismemberment of

the Grant properties. In fact if not intentionally, appellees did "keep the Grant properties intact for development purposes." Insofar as the evidence shows, what could have happened did not happen. Restoration of the 60% working interest to appellants obviated injury to appellees.

■ Because use of the general verdict form required appellees to prove fraud under all of their theories but they failed to prove all elements of at least one, we reverse the judgment that appellants practiced common law fraud.[9] "[A] new trial is required." *Monzingo*, 752 F.2d at 176. We thus remand that portion of the case for a new trial to determine liability and damages.[10] Our disposition of the fraud claim averts any need to address the propriety of various evidentiary rulings of which appellants complain.

## V.

■ Appellants argue, finally, that the two-year statute of limitations governing fraud claims, Tex.Rev.Civ.Stat.Ann. art. 5526 (Vernon 1958 & Supp.1985), expired either before appellees filed suit in November 1977 or before the district court permitted substitution of the Grant Corporation in April 1981 as the real party in interest. The first part of the argument challenges the jury's finding that appellees neither knew nor should have known of appellants' fraud until July 1977. *See, e.g., Wise v. Anderson*, 163 Tex. 608, 359 S.W.2d 876, 879 (1962) (holding that "fraud will prevent the running of the statute of limitations until it is discovered"). The record amply supports the finding. It discloses that appellees first learned of the efforts to sell 60% of the working interest in the summer of 1977, when deposition of Powers' and Freel's secretary revealed the fact. Ratner testified that he "never had a hint of" the sale before the deposition. A reasonable

9. Under our holding in *Braun v. Flynt*, 731 F.2d 1205, 1206 (5th Cir.1984), a general verdict can be upheld "where it is reasonably certain that the jury was not significantly influenced by issues erroneously submitted to it." *Braun* does not avail to save the jury verdict in this case, however, because the record shows that appellees relied heavily upon the common law fraud claim upon which we find a failure of proof.

10. Appellants further argue that appellees produced insufficient evidence of (1) common law fraud under *all* of the six theories, (2) Sioux Pipeline's participating in or benefitting from (and thus its liability for) the fraud, and (3) appellees' actual damages. The contentions lack merit, and we confidently reject them.

jury thus could conclude from the evidence that appellees did not discover the fraud until shortly before they filed suit. The mere fact that appellants breached their obligation under the 1974 agreement to render quarterly accountings did not suffice to put appellees on notice of the fraud so as to defeat their claim of late discovery.

▮▮▮ The second aspect of appellants' limitations argument raises the question of whether the joinder of the Grant Corporation in 1981 related back to the filing of suit in 1977. We hold that it did. Rule 17(a) of the Federal Rules of Civil Procedure provides:

> No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

As Judge Goldberg observed in *Hess v. Eddy*, 689 F.2d 977 (11th Cir.1982), *cert. denied*, 462 U.S. 1118, 103 S.Ct. 3085, 77 L.Ed.2d 1347 (1983):

> The plain language of the Rule clearly provides that when an action is brought by someone other than the real party in interest within the limitations period, and the real party in interest *joins or ratifies* the action after the limitations period has run, the amendment or ratification *relates back* to the time suit was originally filed and the action need not be dismissed as time barred.

689 F.2d at 981 (emphasis supplied in part and in original in part); *see Cummings v. United States*, 704 F.2d 437, 439–40 (9th Cir.1983) ("Such a substitution relates back to the filing of the original complaint."). Since the record shows without dispute that the Grant Corporation joined the suit *and* ratified its maintenance by Ratner and Zuro, the joinder and ratification related back to November 1977. Article 5526 thus did not bar the Grant Corporation from recovering on the fraud claim.

**VI.**

We summarize our holdings. The bankruptcy of appellants did not moot the issues in this appeal. Because appellees did not "purchase" a security, they lacked standing to sue under section 33 A(2) of the TSA and section 12(2) of the 1933 Act. Appellees also failed to prove all the common law fraud theories they advanced under the general charge. Accordingly, we reverse the judgment to the extent it held appellants liable on the securities and common law fraud claims. We also render judgment against appellees on the securities fraud claims; their lack of standing precludes judgment in their favor. The failure of proof regarding the common law fraud claim, however, requires a new trial. We thus remand that part of the case to afford appellees the opportunity to prove liability and damages under properly framed issues. We hold, finally, that the common law fraud statute of limitations did not bar appellees' claim.

REVERSED AND RENDERED IN PART; AND IN PART REVERSED AND REMANDED FOR NEW TRIAL.