927 F.2d 348
 Stephen ADAMS, Appellant,
v.
RESOLUTION TRUST CORPORATION as Receiver for Midwest Federal
Savings and Loan Association; Harold W.
Greenwood, Jr.; Donald Snede; and John
Does 1-10, Appellees.
Stephen ADAMS, Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION (FDIC) as manager of
the FSLIC Resolution Fund, Appellee.
 Nos. 90-5123, 90-5124.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 12, 1990.
Decided Feb. 28, 1991.
 
 Timothy Kelly, Minneapolis, Minn., for appellant.
 Richard J. Osterman and Dina L. Biblin, Washington, D.C., for appellee.
 Before McMILLIAN, Circuit Judge, BRIGHT, Senior Circuit Judge and BOWMAN, Circuit Judge.
 BRIGHT, Senior Circuit Judge.
 
 
 1
 Stephen Adams (Adams) appeals the district court's[1] grant of summary judgment[2] to the Resolution Trust Corporation (RTC) in this action for rescission of a subordinated debt securities agreement which Adams executed in conjunction with his purchase of $2.5 million in subordinated debt securities from now insolvent Midwest Federal Savings and Loan Association (MWF). On appeal, Adams contends that MWF's insolvency does not affect his right to rescind the agreement by which MWF fraudulently induced him to purchase the securities. According to Adams, a post-insolvency rescission would elevate the subordinated debt to general creditor status, entitling him to set off the debt against a promissory note he executed in favor of MWF. Adams also contends that the district court should not have dismissed as moot his common law fraud claim against the RTC, in its capacity as receiver for MWF, merely because MWF possessed insufficient funds to satisfy a successful damages judgment. Finally, he contends that the district court erred in dismissing his related claim against the Federal Deposit Insurance Corporation (FDIC) for violating rateable distribution principles in disposing of MWF's assets. We affirm.
 
 I. BACKGROUND
 
 2
 This case arises out of the failure of the Minneapolis based Midwest Federal Savings and Loan Association (MWF) which we visited in Northwest Racquet Swim & Health Clubs, Inc. v. Resolution Trust Corp., 927 F.2d 355 (8th Cir.1991)--a companion case which we discuss below. Stephen Adams, a Florida businessman with interests in banking, broadcasting and publishing, purchased $2.5 million in subordinated debenture securities (Securities) from MWF on March 31, 1988. Adams financed the purchase with funds he borrowed on an apparently unsecured promissory note he executed in favor of MWF at the time he purchased the Securities. On the same day, Adams executed a subordinated debt securities agreement (Securities Agreement) setting out the terms and conditions of the purchase.
 
 
 3
 The Securities Agreement expressly subordinated Adams' claims in the event of MWF's liquidation, "to all claims ... against [MWF] having the same priority as savings account holders or any higher priority."[3] Joint Appendix (J.A.) 66. It also specified the remedies to apply in the event of default. The Securities Agreement defined default as including failure to make timely payment of the principal or interest due, declaration of insolvency, or the appointment of a conservator, receiver or liquidating agent. A default would also arise in the event that "any representations or warranty made in writing by or on behalf of [MWF] herein or in connection with the transactions ... shall prove to have been false or incorrect in any material respect on the date as of which made." J.A. 69.
 
 
 4
 In the event of a default, the remedies section provided that Adams could protect and enforce his rights by an action in law, suit in equity, or other appropriate proceeding. However, the Securities Agreement placed three significant limitations upon Adams' rights, powers and remedies. First, he could accelerate payment in the event of default only to the extent that such payment did not leave MWF with insufficient capital to meet regulatory capital requirements set out in 12 C.F.R. Sec. 563.13 (1988). Second, in the event that the Federal Savings and Loan Insurance Corporation (FSLIC) was appointed receiver of MWF, FSLIC would have no obligation to arrange for the assumption of the Securities. Finally, the Securities Agreement bound Adams to abide by the priority scheme set out in the Federal Home Loan Bank Board[4] (Bank Board) regulations governing the distribution of assets in liquidation proceedings.[5]
 
 
 5
 The sale of the Securities was contingent upon Bank Board approval pursuant to 12 C.F.R. Sec. 563.8-1 (1988), governing the issuance of subordinated debt securities by federal savings and loan associations. By letter dated March 31, 1988, Donald Snede, MWF's chief financial officer, stated that the Bank Board had approved the issuance of the note. The Bank Board apparently had given prior approval, on December 21, 1987, to the sale and issuance of up to $25 million in MWF subordinated debt securities.
 
 
 6
 MWF immediately applied the Securities to its regulatory capital.[6] From March 31, 1988 through November 1988, the Bank Board recognized the Securities as part of MWF's regulatory capital. In January 1989, however, the Bank Board issued a directive ordering MWF to prospectively remove the Securities from regulatory capital because Adams had purchased them with funds he had borrowed from MWF on an unsecured basis.
 
 
 7
 On February 13, 1989, the Bank Board declared MWF insolvent after finding that its obligations to its creditors (including savings account holders) exceeded its assets. Accordingly, the Bank Board exercised its statutory authority under 12 U.S.C. Sec. 1464(d)(6)(A)(i) (1988), and named FSLIC as conservator of MWF. FSLIC attempted to operate MWF as a going concern.
 
 
 8
 On March 21, 1989, Adams filed the initial complaint against MWF and its officers which gave rise to this action. Adams brought claims for violations of federal and state securities laws, alleging that MWF had fraudulently induced him to purchase the Securities by making material misrepresentations regarding its financial condition at the time of the transaction.[7] Adams asked the court to declare the Securities Agreement subordinating the investment rescinded and to set off the unpaid balance of the Securities obligation against a $7,485,000 promissory note which he owed to MWF.[8] He also sought damages for common law fraud.
 
 
 9
 Soon after, on April 7, 1989, MWF informed Adams that it would default on the 1989 first quarter interest payment due on the Securities. On May 4, 1989, the Bank Board, noting that MWF's liabilities continued to exceed its assets, concluded that MWF could not be operated as a going concern. The Bank Board, acting pursuant to statutory authority, 12 U.S.C. Sec. 1464(d)(6)(A) (1988); 12 C.F.R. Sec. 547 (1988), appointed FSLIC as receiver for the purpose of liquidating MWF. FSLIC, by operation of law, thus took possession of MWF and succeeded to all of MWF's rights, titles, powers and privileges. See 12 U.S.C. Secs. 1464(d), 1729 (1988). In addition, the Bank Board determined that the total liquidation of MWF would not generate sufficient funds to satisfy the claims of MWF's general creditors. Therefore, it formally declared all subordinated debt and equity interests in MWF to be worthless.[9]
 
 
 10
 The Bank Board also contemporaneously created a new savings and loan association, Midwest Savings Association (Midwest Savings), to facilitate the liquidation of MWF and the reorganization of its assets. The Bank Board immediately placed Midwest Savings under FSLIC conservatorship. It further directed FSLIC to enter into a purchase and assumption agreement with Midwest Savings, transferring most of MWF's assets to Midwest Savings in consideration for Midwest Savings' assumption of certain MWF liabilities.
 
 
 11
 Under the purchase and assumption agreement, Midwest Savings did not assume any MWF subordinated debt or equity liabilities or obligations, including the securities at issue here. As a result of this transaction, the obligations arising from the Securities remained with FSLIC, as receiver for MWF, while Midwest Savings assumed possession of the promissory notes against which Adams sought to exercise his claimed right of setoff.
 
 
 12
 Adams responded to these regulatory actions by discontinuing payment on the promissory note now held by Midwest Savings. He also filed a second complaint, on June 28, 1989, against FSLIC in its corporate capacity, in which he contended that the purchase and assumption agreement violated rateable distribution principles implicit in the statutory provision governing the liquidation of failed thrifts, 12 U.S.C. Sec. 1729 (1988). Adams contended that FSLIC should not have transferred Adams' $7,485,000 note to Midwest Savings because it knew that Adams sought to set it off against the Securities which FSLIC also knew MWF had fraudulently induced Adams to purchase. Adams contended that his rescission entitled him to share in the pro rata distribution of MWF's assets to the general creditors. Adams consequently asked the court to declare the purchase and assumption agreement invalid and permit him to set off the Securities obligations against his MWF loan obligations now held by assignee Midwest Savings.
 
 
 13
 In February 1990, the district court granted FSLIC's motion for summary judgment in the first action. Adams v. Resolution Trust Corp., 731 F.Supp. 352 (D.Minn.1990).[10] The district court adopted the analysis of the Second Circuit in In re Weis Securities, Inc., 605 F.2d 590 (2d Cir.1978), cert. denied, 439 U.S. 1128, 99 S.Ct. 1045, 59 L.Ed.2d 89 (1979), and held, as a matter of law, that because MWF had applied the funds from the sale of the Securities to regulatory capital, Adams was precluded from rescinding the Securities Agreement after the Bank Board had declared MWF insolvent. The Securities, therefore, remained subordinated, and thus lacked the requisite mutuality of obligation necessary to set them off against the promissory note.
 
 
 14
 The district court also dismissed as moot Adams' claim for common law fraud. The Bank Board's determination that Adams' subordinated debentures were worthless because MWF's assets were insufficient to satisfy general creditor liabilities meant, according to the district court, that FSLIC, as receiver, simply had no assets with which to satisfy a judgment if Adams were to succeed on his common law fraud damages claim. Thus, the court dismissed the damages action on prudential grounds.
 
 
 15
 In a separate proceeding, the district court also dismissed Adams' second action against FSLIC seeking to invalidate the purchase and assumption agreement with Midwest Savings.[11] The district court again held that because Adams could not rescind the Securities Agreement, he remained a subordinated interest who had no right to participate in the pro rata distribution of assets to the general creditors.[12]
 
 
 16
 Adams filed this consolidated appeal.
 
 II. DISCUSSION
 
 17
 All but one of Adams' contentions on appeal hinge upon the validity of the district court's determination that the application of his investment to MWF's regulatory capital precluded him from rescinding the Securities Agreement after the date of MWF's insolvency. We addressed this very issue in Northwest Racquet Swim & Health Clubs, Inc. v. Resolution Trust Corp., 927 F.2d 355 (8th Cir.1991), which was argued before this court on the same day we heard the present appeal. In Northwest Racquet, we held that where investors in a federally regulated institution subordinate their claims in such a manner as to make the investments eligible for use as regulatory capital, and where the issuing institution applies such investments to regulatory capital, the investments must be regarded as fully encumbered by the regulatory obligation to remain subordinate to the claims of depositors and general creditors in the event of insolvency.
 
 
 18
 The Securities and Securities Agreement at issue in this case are nearly identical to those discussed in Northwest Racquet. As in Northwest Racquet, there is no dispute that the investment, in fact, was included in MWF's regulatory capital from March through November 1988. Further, the underlying allegations of fraud in the inducement presented in each case also are nearly identical. We therefore refer the reader to our discussion in Northwest Racquet, and hold that MWF's insolvency precludes Adams from rescinding the Securities Agreement.[13] Adams' claim therefore remains subordinate to the claims of general creditors. The continuing subordinated status of the Securities means that they lack the requisite mutuality of obligation required to set them off against the promissory note which holds a superior general creditor rank.[14] The continuing subordination also means that Adams is not entitled to share in any pro rata distribution of assets with MWF's general creditors. Because Adams has no right to participate in any pro rata distribution of assets to general creditors, we also hold that the district court properly dismissed his claim attacking the validity of the purchase and assumption agreement between FSLIC and Midwest Savings.
 
 
 19
 One final issue merits individual attention. Adams contends that the district court should not have dismissed as moot his common law fraud claim for damages against FSLIC in its capacity as receiver for MWF. We agree with the district court's decision declaring the claim moot on prudential grounds because the Bank Board's determination that MWF's assets were insufficient to meet the claims of general creditors meant that the court could not grant subordinate debt holder Adams any effectual relief. 731 F.Supp. at 357-58.
 
 
 20
 Although it is true, as Adams contends, that in some instances a claim for damages is not mooted merely because of the insolvency of the defendant, see Ratner v. Sioux Natural Gas Corp., 770 F.2d 512 (5th Cir.1985), "the feasibility or futility of effective relief should a litigant prevail" remains a crucial consideration in this court's determination of whether to adjudicate a claim on its merits. In re AOV Indus., Inc., 792 F.2d 1140, 1147-48 (D.C.Cir.1986). To satisfy the case or controversy requirement of Article III of the Constitution, Adams' claimed injury must be redressable by a favorable judicial decision. Iron Arrow Honor Society v. Heckler, 464 U.S. 67, 70, 104 S.Ct. 373, 374, 78 L.Ed.2d 58 (1983) (per curiam).
 
 
 21
 The Bank Board formally determined that the claims of subordinated debt holders like Adams are worthless. We are bound by the Bank Board's worthlessness determination in this proceeding.[15] See Gulley v. Sunbelt Sav., F.S.B., 902 F.2d 348, 351 (5th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 673, 112 L.Ed.2d 665 (1991); Village South Joint Venture v. Federal Deposit Ins. Corp., 733 F.Supp. 50 (N.D.Tex.1990); Federal Sav. & Loan Ins. Corp. v. Locke, 718 F.Supp. 573, 586 (W.D.Tex.1989). The import of this determination is that FSLIC, as receiver for MWF, will never have any assets with which to satisfy a common law fraud judgment. Under these circumstances, we follow the axiomatic principle that when "it [is] impossible for [a] court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief whatever, the court will not proceed to a formal judgment."[16] Mills v. Green, 159 U.S. 651, 653, 16 S.Ct. 132, 133, 40 L.Ed. 293 (1895).
 
 
 22
 Adams contends that adjudication of his claim on the merits is warranted, nonetheless, because resolution of the fraud claim on the merits would aid him in pursuing his pending claims against the former officers of MWF individually. Prudential concerns of judicial economy and preservation of scarce judicial resources counsel that Adams pursue any overlapping issues of fraud within the context of those proceedings.
 
 III. CONCLUSION
 
 23
 For the reasons expressed above, we affirm the judgment of the district court.
 
 
 
 [1]
 The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota
 
 
 [2]
 The district court's decision is reported as Adams v. Resolution Trust Corp., 731 F.Supp. 352 (D.Minn.1990)
 
 
 [3]
 The priority scheme governing claims against an insolvent thrift institution placed savings account holders in the sixth priority position after various administrative costs, expenses and debts associated with the operation of the receivership, various wage and benefits claims of the employees of the failed thrift, and certain government tax claims. 12 C.F.R. Sec. 569c.11 (1989)
 
 
 [4]
 The Federal Home Loan Bank Board acted as the principal regulator of the federal savings and loan industry until August 9, 1989, when Title IV of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, 103 Stat. 354, abolished the Bank Board and replaced it with the Office of Thrift Supervision
 
 
 [5]
 Under the regulatory priority scheme, see note 4, the claims of subordinated debt holders like Adams held a ninth rank priority, behind the claims of all general creditors, and ahead only of equity interest holders. 12 C.F.R. Sec. 569c.11 (1989)
 
 
 [6]
 Regulatory capital is the sum of, inter alia, reserve accounts, retained earnings, permanent common stock, securities which constitute permanent equity capital, appraised equity capital and any other nonwithdrawable accounts which constitute the institutions reserves available for satisfying the claims of depositors and other account holders. See 12 C.F.R. Sec. 561.13 (1988). Pursuant to statutory authority, 12 U.S.C. Sec. 1464(s) (1988), the Bank Board, and its successor, the Office of Thrift Supervision (OTS), sets the minimum capital requirements for the industry. Since 1973, the Bank Board or OTS has permitted thrift institutions to include long-term subordinated debt securities as part of their regulatory capital because such securities possess many of the characteristics of permanent capital. 54 Fed.Reg. 34,148 (1989) (commentary accompanying Final Rule amendments to regulations governing the issuance and use of subordinated debt (codified at 12 C.F.R. Sec. 563.13 (1989))); 12 C.F.R. Sec. 561.13 (1988)
 
 
 [7]
 Adams alleged that MWF and its officers did not disclose that one of its assets, which was carried on its books at over $100 million, was the subject of a legal dispute which brought its actual value into question. The dispute over the asset, currently the subject of litigation in federal court, brought into question at least $100 million of MWF's $140 million regulatory capital base, according to Adams. He asserted that MWF's nondisclosure and the resulting misrepresentations regarding its financial condition violated Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), Rule 10b-5 of the Securities Exchange Commission, 17 C.F.R. Sec. 240.10b-5 (1988), Sec. 12(2) of the Securities Act of 1933, 15 U.S.C. Sec. 77l, and Minn.Stat. Sec. 80A.01 (1986), and also constituted common law fraud and breach of contract
 
 
 [8]
 See note 3
 
 
 [9]
 The settlement of claims in the event of liquidation proceeded under an absolute priority scheme, meaning that ninth and tenth priority subordinated debt and equity holders could receive treatment of their claims only after all claims of the first eight ranks had been fully settled. See 12 C.F.R. Sec. 569c.11(d) (1989). Thus, the Bank Board's determination that MWF's assets were insufficient to satisfy the claims of seventh priority general creditors meant that no money remained for the claims of ninth priority subordinated debt holders like Adams
 
 
 [10]
 In August 1989, as part of the overhaul of the thrift industry embodied in the Financial Institutions Reform, Recovery, and Enforcement Act, Congress abolished Federal Savings and Loan Insurance Corporation (FSLIC) and replaced it with the Resolution Trust Corporation (RTC). Pub.L. No. 101-73, Title IV, 103 Stat. 354 (1989). During the pendency of the proceedings before the district court, the parties accordingly stipulated to the substitution of RTC, for FSLIC, as receiver of MWF
 
 
 [11]
 During the pendency of this action, Congress abolished FSLIC, in its corporate capacity, and replaced it with the Federal Deposit Insurance Corporation (FDIC). Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub.L. No. 101-73, Title IV, 103 Stat. 354. FDIC, accordingly, now stands in FSLIC's place as defendant and appellee in Adams' second filed action regarding the purchase and assumption agreement
 
 
 [12]
 For the same reasons, the district court also denied Adams' motion to preliminarily enjoin FSLIC from further transferring the assets of MWF and from enforcing the promissory note which Adams had ceased paying. Because Adams was not entitled to rescind the Securities Agreement, the Securities obligation remained subordinated to the higher priority promissory note of general creditor rank. Thus, Adams had no legal interest in the note which might justify enjoining its further transfer
 
 
 [13]
 We also note that Adams, unlike the plaintiff in Northwest Racquet, did not initiate any remedial action against MWF prior to the declaration of MWF's insolvency. Northwest Racquet attempted to exercise its contractual right to accelerate payment prior to the declaration of insolvency. Adams, by comparison, did not take any remedial action until he filed his initial complaint on March 21, 1989, five weeks after the declaration of insolvency. Thus, the facts of this case provide an even stronger basis for holding that the subordinated debt holder is precluded from rescinding than those presented in Northwest Racquet
 
 
 [14]
 Generally, the right to setoff exists only as to mutual debts. See, e.g., Soo Line R.R. v. Escabana & Lake Superior R.R., 840 F.2d 546, 551 (7th Cir.1988). To exhibit the requisite mutuality, the debts must be in the same right. See 5A Michie, Banks & Banking ch. 9, Sec. 115c (1983). Subordinated debentures, however, do not exist in the same right as promissory notes, thus they may not be set off against each other. See FDIC v. Texarkana Nat'l Bank, 874 F.2d 264, 268-69 (5th Cir.1989) (subordinated debentures in insolvent bank do not, as a matter of both law and equity, meet mutuality of obligation test); see also FDIC v. de Jesus Velez, 678 F.2d 371 (1st Cir.1982) (subordinated debentures in insolvent bank not mutually extinguishable with promissory notes)
 
 
 [15]
 A Bank Board determination of worthlessness is a "final agency action, which is reviewable under the provisions of the Administrative Procedure Act[, 5 U.S.C. Secs. 701-706,] in an action against the Bank Board, but not subject to collateral attack through discovery or other means in individual lawsuits against the receiver." Federal Sav. & Loan Ins. Corp. v. Locke, 718 F.Supp. 573, 586 (W.D.Tex.1989). Adams has not directly challenged the Bank Board's worthlessness determination. Rather, he has attacked the determination only collaterally, in the context of this action, which does not name the Bank Board as a party to the litigation, but is stated simply against the RTC, as receiver for MWF. Such a collateral attack is not sufficient to create a justiciable issue in the context of the present case. In the absence of a prior adjudication that the Bank Board's worthlessness determination was arbitrary and capricious, Adams has failed to sufficiently state a claim upon which relief could be granted
 
 
 [16]
 In Ratner v. Sioux Natural Gas Corp., 770 F.2d 512 (5th Cir.1985), which Adams cites in support of his arguments, the court, in addressing a mootness defense by an insolvent corporation, stated that the "mere possibility that a judgment debtor lacks the means to satisfy its monetary liability" does not necessarily mean that the case is moot. 770 F.2d at 516 (5th Cir.1985). Here we are dealing not with the "mere possibility," but rather an absolute certainty that defendant RTC, as receiver for MWF, lacks the means to satisfy a judgment on the common law fraud claim. See Federal Sav. & Loan Ins. Corp. v. Locke, 718 F.Supp. 573, 587 n. 4 (W.D.Tex.1989). Adams contends that pending litigation over disputed MWF assets raises the possibility that some money may be available, at some future date, to satisfy a common law fraud judgment. This argument, however, overlooks the fact that the assets now belong to Midwest Savings as a result of the purchase and assumption agreement, not to the RTC, as receiver for MWF. RTC no longer holds any MWF assets, let alone assets which might be used to satisfy a judgment in favor of Adams