CINCINNATI INSURANCE COMPANY, Appellee,

v.

DIEBOLD, INC., Appellant.

[Cite as *Cincinnati Ins. Co. v. Diebold, Inc.* (1989), 64 Ohio App.3d 273.]

Court of Appeals of Ohio,
Montgomery County.

No. 11482.

Decided Sept. 13, 1989.

*Mark J. Huller,* for appellee.

*Stephen C. Lane* and *Stephen J. Brewer,* for appellant.

FAIN, Judge.

This is an appeal from a judgment in the amount of $18,800 recovered by plaintiff-appellee Cincinnati Insurance Company ("CIC") against defendant-appellant Diebold, Inc., together with an award of attorney fees in the amount of $5,005. Diebold contends that its employee, Kelly Moore, was not acting within the course and scope of his employment when he stole $18,800 in money contained in one safe-deposit box while "drilling" (changing the locks on) nine safe-deposit boxes pursuant to a contract between his employer and CIC's subrogor, Farmer's Banking Company, N.A. ("Farmer's Bank"). Diebold also contends that any liability on its part owed to Farmer's Bank, and therefore to CIC, as Farmer's Bank's subrogee, was avoided by virtue of an indemnification agreement executed by Farmer's Bank in connection with the work. Finally, Diebold contends that the trial court erred when it awarded attorney fees, since, as to Diebold, this was an action for money damages rather than for the return of property.

We agree with Diebold that the indemnification agreement executed by Farmer's Bank was enforceable and operated to bar any vicarious liability on Diebold's part. We also agree with Diebold that attorney fees may not be awarded in an action for money damages. Accordingly, the judgment of the trial court will be reversed, and this court will enter judgment in Diebold's favor upon CIC's complaint against Diebold.

## I

Diebold was retained by Farmer's Bank to "drill," or change the locks on, nine safe-deposit boxes maintained by the bank. In that connection, Moore, Diebold's employee, went into the bank's vault to perform that service.

One of the nine boxes serviced by Moore was No. 474, which the bank had included by error in the list of boxes to be drilled. When Moore drilled this box open, he discovered that it contained money in the amount of $18,800.

This money belonged to the owners of the box, Jack and Jacqueline Woods. Moore took the money and converted it to his own use. Moore subsequently pled guilty to a theft offense in the United States District Court for the Southern District of Ohio, and admitted that he stole the money contained in the box.

Moore completed drilling the boxes on December 5, 1985. Jacqueline Woods discovered the theft on December 16, 1985, when she sought access to Box No. 474, and representatives of Farmer's Bank first realized that Box No. 474 had been drilled by mistake. At this time, Farmer's Bank became aware of the fact that $18,800 was missing from the box.

When the matter of the missing money was first brought to the attention of Diebold, Moore was asked about the money but denied having seen it. It was not until Moore entered a plea of guilty to the theft of the money that his employer knew for a fact that Moore had stolen it.

CIC made good the loss pursuant to an insurance bond that it had provided to Farmer's Bank. Consequently, CIC became subrogated to the bank's claims against Moore and Diebold. CIC brought this action against Moore and Diebold, and obtained summary judgment against Moore.

With respect to CIC's claim against Diebold, the trial court ordered the preparation and filing of a joint stipulation of facts, and a submission of the case on briefs. The parties filed a joint stipulation of facts and briefs, pursuant to the order of the trial court, and the trial court rendered judgment for CIC against Diebold in the amount of $18,800, and also awarded attorney fees against Diebold in the amount of $5,005. From the judgment and award of attorney fees, Diebold appeals.

## II

Diebold's first assignment of error is as follows:

"The trial court erred in rendering judgment in favor of CIC and against Diebold in the amount of $18,800 plus interest from December 3, 1985."

A nice question is presented as to whether Diebold can be held vicariously liable for the theft by its employee, Moore. Both sides have presented impressive authority in support of their respective positions, and resolution of this question would seem to depend upon whether a party in the position of Farmer's Bank could reasonably rely upon a party in the position of Diebold to ensure that its employee does not take advantage of any opportunity that might naturally arise in the course of gaining access to safe-deposit boxes to steal the contents thereof. We find it unnecessary to resolve this issue because of the indemnification agreement executed by Farmer's Bank as part

of its authorization to Diebold to perform the work. That language, contained in a document known as a "call report" is as follows:

### "AUTHORIZATION FOR FORCIBLE ENTRY

"The undersigned affirms that he is legally authorized to request the opening of such equipment by Diebold, Inc. and agrees to hold harmless and indemnify Diebold or its employees against all costs, expenses, losses, damages, actions or causes of actions which may result from or arise out of the work or services to be performed hereunder."

The trial court held the foregoing indemnification provision to be both ambiguous and contrary to public policy insofar as it purported to indemnify Diebold for the intentional misconduct of its employee.

■ We do not concur in the trial court's finding that the indemnification provision quoted above is ambiguous. We conclude that it is a broad indemnification provision, in clear and unambiguous language, operating to indemnify Diebold for any liability that might arise out of the performance of the drilling services. If Moore's theft of the money from one of the safe-deposit boxes is sufficiently related, for purposes of the imposition of vicarious liability, to the drilling services that Diebold contracted to provide, then it must also be deemed to have arisen out of those services, and is within the scope of the indemnification provision.

In reaching the conclusion that the above-quoted indemnification provision is contrary to public policy and, therefore, is unenforceable, the trial court relied upon *Cumpston v. Lambert* (1849), 18 Ohio 81; *Direct Transp. Co. v. Baltimore & Ohio RR. Co.* (1953), 96 Ohio App. 204, 54 O.O. 257, 121 N.E.2d 565; and *Jackson v. Bryant* (1929), 33 Ohio App. 468, 169 N.E. 825. None of those cases involves vicarious liability; the first two cases stand for the proposition that an actor may not relieve himself of the civil liability consequences of his willful misconduct by virtue of a contract of indemnification; the third, *Jackson v. Bryant*, did not involve an indemnification contract, but rather a contract for the purchase and sale of a vehicle in which the contract itself directly invaded the rights of a holder of a lien upon the vehicle, and this was known to the defendant-contracting party.

In *Direct Transp. Co. v. Baltimore & Ohio RR. Co., supra*, the plaintiff had agreed to the following contractual provision with the defendant railroad company:

"Said contractor agrees to and does hereby release all his claims on account of injury to or death to himself, or damage to or loss of any of his property arising in any manner whatsoever in the performance of the obligations he

has undertaken in this agreement, whether the negligence of said Baltimore Company contributed thereto in whole or in part."

The above-quoted language, being a release of liability couched in terms as broad as the indemnification provision in the case before us, was upheld as not being contrary to public policy. The court stated the general principle as follows:

"On the ground that there is neither disparity of bargaining power between the contracting parties nor a social reason for preserving the legal incidents of the relationship of the parties, we hold that they should be allowed in law to freely contract in reference to situations confronting them. Under this view of the contract, the exculpating provision in this case cannot be successfully challenged."

There is an obvious "social reason" for preventing an actor from escaping civil liability for his own intentional misconduct, by virtue of an indemnification provision. We do not want actors to be free to perpetrate intentional misdeeds without any fear of consequences. However, that reason does not extend to purely vicarious liability, such as the liability of an employer for the acts of its employee, when the employer neither procures, condones, ratifies, nor connives in its employee's misdeed. There is no evidence in this case that Diebold had done anything to encourage its employee, Moore, to steal money from the safe-deposit boxes that he drilled pursuant to Diebold's contract with Farmer's Bank.

In the absence of any contrary undertaking between the parties, vicarious liability is imposed upon an employer for the wrongful acts of the employee, at least under certain circumstances, because of the theory that the employer, in certain circumstances, is in a better position than the victim of that misconduct to ensure against the possibility of misconduct by its employee, especially where the nature of the employer's business exposes potential victims to a heightened risk. However, the same reason for preventing the parties from expressly relieving one of them from civil liability for intentional misconduct does not apply to purely vicarious liability. In the case before us, Farmer's Bank and Diebold might rationally have concluded that the bank was in a better position to monitor Diebold's employee and to guard against the possibility that that employee might take advantage of the access afforded by his work to steal money from the safe-deposit boxes; it would be natural, then, for the bank to agree to indemnify Diebold against any resulting liability, and there is no public policy against such indemnification because it

would not indemnify the miscreant from liability for his own misconduct.[1]

CIC cites *Sanfillipo v. Rarden* (1985), 24 Ohio App.3d 164, 24 OBR 253, 493 N.E.2d 991, in support of its position that public policy precludes indemnification against even vicarious liability as a result of intentional misconduct. In that case, a trial court had granted summary judgment in favor of both a real estate agent and her principal upon a claim of fraudulent misrepresentation brought by a husband and wife who relied upon the real estate broker for services in connection with the purchase of certain unimproved real estate. The court of appeals reversed a summary judgment, finding that there were genuine issues of material fact as to whether the misrepresentations by the real estate agent were knowing and intentional. The court of appeals did not separately address the issue of the principal's vicarious liability for the misconduct of its agent. Even if the court of appeals had held that the principal could be liable for the fraudulent representations of its agent, notwithstanding a provision in the contract with the purchasers purporting to avoid any such liability, that case would be distinguishable from the case before us. The allegedly fraudulent misrepresentations made by the real estate broker in that case were in no sense incidental to the provision of services to the purchasers of the property, but were professional services that were integrally related to the purpose for which the principal was retained, and, under the circumstances of that case, the consumer might well be held to be entitled to treat the representations of the agent as having been made by her principal. In the case before us, although the employee's theft occurred while he was changing the locks on the safe-deposit boxes, his theft of money from one of those boxes was in no way related to the contractual purposes for which his employer was retained. Therefore, we conclude that *Sanfillipo v. Rarden, supra,* even if it is deemed to hold that liability on the part of the real estate broker's principal could not be avoided by virtue of the contractual provision with the consumer, is distinguishable.

In conclusion, we hold that the provision whereby Farmer's Bank, CIC's subrogor, undertook to indemnify and to hold harmless Diebold with respect to any liability resulting from or arising out of the drilling of the safe-deposit boxes, was enforceable with respect to purely vicarious liability not the result of any intentional misconduct by Diebold, and precludes liability in this case.

Diebold's first assignment of error is sustained.

---

1. The indemnification provision in this case purports to indemnify both Diebold and its employees against liability. To the extent that any attempt would be made to apply that provision to bar the liability of Moore, the employee, we agree that the application of that indemnification provision to extend to Moore's liability for his own intentional misconduct would be contrary to public policy and, therefore, unenforceable.

## III

Diebold's second assignment of error is as follows:

"The trial court erred in awarding attorneys' fees to the plaintiff in the amount of $5,005."

The trial court and CIC rely upon *Fulks v. Fulks* (1953), 95 Ohio App. 515, 54 O.O. 131, 121 N.E.2d 180, as authority for the exception to the general rule that each party is responsible for his own attorney fees. In that case, the court distinguished between those attorney fees expended in an effort to recover possession of the converted property, in that case, a steer, and those attorney fees expended generally in the prosecution of the action, holding that only the attorney fees expended to recover possession of the property were awardable.

In the case before us, as Diebold points out, there is no allegation that Diebold received any of the money that its employee, Moore, stole from the safe-deposit box. Furthermore, the money that was in the Woodses' safe-deposit box was never owned by CIC or its subrogor, Farmer's Bank. Therefore, this action cannot be properly regarded as an action to recover possession of property, but can only properly be regarded as an action to recover money damages for the wrongful conversion of that property. Therefore, *Fulks v. Fulks, supra,* is distinguishable, and there is no reason to depart from the general principle that each litigant is responsible for his own attorney fees.

Diebold's second assignment of error is sustained.

## IV

Diebold's first assignment of error having been sustained, the judgment of the trial court will be reversed and this court will enter judgment in Diebold's favor upon CIC's complaint, being the judgment to which Diebold is entitled as a matter of law, in accordance with App.R. 12(B).

*Judgment accordingly.*

WILSON and GRADY, JJ., concur.