**In re NATIONAL HYDRO–VAC INDUSTRIAL SERVICES, L.L.C., Debtor.**

**National Hydro–Vac Industrial Services, L.L.C., Plaintiff,**

**v.**

**Federal Signal Corporation; Guzzler Manufacturing, Inc., Defendants,**

**Transamerica Equipment Financial Services Corporation, Intervener.**

**Bankruptcy No. 5:01–BK–50466M. Adversary No. 5:01–AP–5016.**

United States Bankruptcy Court, E.D. Arkansas, Pine Bluff Division.

June 15, 2004.

Brian Rosenthal, Herbert C. Rule, III, Rose Law Firm, Kevin P. Keech, Keech Law Firm, Little Rock, AR, for Debtor.

Thomas S. Streetman, Streetman, Meeks & McMillan, Crossett, AR, for Trustee.

William S. Meeks, Streetman, Meeks & McMillan, Crossett, AR, pro se.

Charles W. Tucker, U.S. Trustee's Office, Little Rock, AR, for U.S. Trustee.

Stephen L. Gershner, Davidson Law Firm, Little Rock, AR, for Defendant.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

National Hydro–Vac Industrial Services, L.L.C. ("Debtor") petitioned for relief under the provisions of Chapter 11 of the United States Bankruptcy Code on March 15, 2001. On April 3, 2001, the Debtor filed a complaint against Federal Signal Corporation ("Federal Signal") for the turnover of three specially manufactured pieces of equipment or the proceeds from the sale of the units in the sum of $188,000.00.

Transamerica Equipment Financial Services Corporation ("Transamerica") filed a complaint in intervention on June 26, 2001, alleging that it held perfected security interests in the three units in question, which were allegedly sold by Federal Signal. Transamerica asserted a lien in the sale proceeds held by Federal Signal.

On June 27, 2001, the Debtor's complaint was amended to add Guzzler Manufacturing, Inc. ("Guzzler"), a subsidiary corporation of Federal Signal, as a party defendant. The amended complaint alleged conversion and breach of fiduciary duty on the part of both defendants. The amended complaint asked for the turnover of the sale proceeds of the units in question pursuant to 11 U.S.C. § 542, damages resulting from conversion of the property, punitive damages, attorney's fees, and costs.

Federal Signal's answer to the original complaint denied that it had any property of the Debtor and asserted that the equipment in question had been sold prior to the date the bankruptcy petition was filed. Federal Signal filed an answer to Transamerica's complaint in intervention, alleging that it lacked knowledge of Transamerica's rights. On July 13, 2001, Federal Signal and Guzzler answered the first amended complaint, denying the allegations and asserting a right of setoff.

Subsequently, the case was converted to Chapter 7 on July 20, 2001, and William S. Meeks was appointed Trustee. After the conversion, the Trustee assumed the Debtor's cause of action.

Trial on the merits was held in Little Rock, Arkansas, on January 29, 2004, and the matter was taken under advisement to review the evidence and briefs. This Court has jurisdiction in accordance with 28 U.S.C. § 1334 and § 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E) (2000), and this Court may enter a final judgment in this case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The Debtor is an Arkansas limited liability company formed at Pine Bluff, Arkansas, and later headquartered in the Houston, Texas, area. (Tr. at 105.) At some

point in time prior to spring of 2000, the Debtor purchased certain assets of the Freemyer Company. These assets included the three industrial vacuum units manufactured by Guzzler that are the subject of this litigation.

### TWO UNITS SOLD TO VAC–TECH

John Stafford, the Used Equipment and Service Sales Manager of Guzzler in 2000, was called as a witness by the Trustee. He testified that sometime in early 2000 (at least a year prior to the bankruptcy filing), he was contacted by Guzzler's New Equipment Sales Manager about a possible transaction whereby the Debtor would transfer three pieces of used equipment in exchange for the purchase of one new one. (Tr. at 13.)

Stafford expressed interest in the transaction but wanted to inspect the equipment. As a result, the equipment was transported to Birmingham, Alabama, for inspection. The inspection was conducted at some time prior to April and was satisfactory. He said the New Equipment Sales Manager subsequently "proceeded with a deal to trade three in for one new one." (Tr. at 15.)

Stafford began contacting customers to resell three units. He stated, "In the process of our contact, we started to refurbish the vacuum equipment and make lists and that sort of thing to decide what needed to be done to the equipment so that it could be sold." (Tr. at 16.)

Guzzler reached an agreement with Vac–Tech, a company located in Australia, and entered into a written contract to sell two of the units at issue to Vac–Tech. The sale and delivery were completed by August 2000. The purchase price for each of the units was $110,000.00.

Stafford testified that the original trade-in deal with the Debtor fell through and subsequently Guzzler reached an agreement with the Debtor to sell two of the units to Guzzler for $65,000.00 each. Stafford never testified as to exactly when the oral agreement to sell the units occurred. He said, "I originally prepared these Bills of Sale [between the Debtor and Guzzler] for $75,000.00 when they [sic] agreement was made on the first unit. That's when we agreed to take the three trades for one. I made the Bills of Sale somewhere in that time frame." (Tr. at 81.)

Stafford stated that he listed $75,000.00 as the purchase price in the two bills of sale even though the true sale price was $65,000.00. This was done, he said, to conceal the real selling price. Stafford stated after the sales from the Debtor to Guzzler were completed, Guzzler determined to exercise its right of set off and credited the sale price against the Debtor's account with Guzzler.

Robert Racic, a former employee of Federal Signal, was called as a witness by the Debtor. He acknowledged that the Debtor's account with Federal Signal Leasing maintained on behalf of Guzzler was credited in the amount of $97,973.32 in November 2000 and, at that point, there was still a balance of $97,803.44 that was past due.[1] This credit was applied from the proceeds of the sale of the two units to Vac–Tech. He acknowledged he received the $110,000.00 purchase price per unit from Vac–Tech June 21, 2000, but the credit to the Debtor's account of $97,973.32 did not occur until November 1, 2000. The Debtor's separate account with Guzzler was credited in the amount of $32,026.68. (Pl.'s Ex. 5.) Thus, the Debtor received a total of $130,000.00 in credit toward vari-

---

1. Federal Signal is the parent company of Guzzler, and Federal Signal Leasing operates some financial and bookkeeping functions for Guzzler, the exact nature of which is unclear.

ous accounts owed to Federal Signal and Guzzler.

The relevant events were recalled by the Debtor's former President, Raymond Pascale. He testified that after the Debtor purchased some tractor-mounted vacuum units, he had asked Guzzler to inspect the equipment. The two units later sold to Vac–Tech and other units were transported to Guzzler's facility in Alabama. He stated that Stafford called him some time in May or June 2000, and asked if Pascale would be willing to sell two trailer-mounted vacuum units. (Tr. at 107.) The units were encumbered by a lien securing a debt to Transamerica. After some negotiation, Pascale indicated a willingness to sell the units for $75,000.00 each and Stafford agreed to that price.

Stafford prepared two bills of sale for each of the units, both dated August 1, 2000, and forwarded them to Pascale. (See Pl.'s Exs. 17, 18.) The bills of sale reflected the Debtor as the seller and Guzzler as the buyer. (Tr. at 109.) The stated purchase price was $75,000.00 for each unit.

Pascale signed both bills of sale as representative of the Debtor and returned them to Stafford around August 1, 2000. Pascale testified that Transamerica had been granted a lien in the 80 units purchased from Freemyer by the Debtor, and a "certain value" had been assigned to each of the units. (Tr. at 110.) From the proceeds of the sale of the two units, Pascale intended to pay some or all of the indebtedness owed on each unit to Transamerica. He stated $75,000.00 for each of the units sold to Guzzler would be "a bit short" in defraying the indebtedness to Transamerica. (Tr. at 110.)

The Debtor never received any of the proceeds from the sale of the two units to Guzzler. Pascale testified that he never authorized Guzzler or Federal Signal to setoff or credit the sale proceeds against the Debtor's obligation to Guzzler or Federal Signal. He stated he was surprised when the Debtor's account with Guzzler was credited rather than the proceeds being sent to the Debtor. (Tr. at 114.) Pascale did not testify when payment was due from Guzzler to the Debtor, except he stated that he expected to receive $150,000.00 after he signed the two bills of sale. (Tr. at 110.)

### THIRD UNIT SOLD TO ACE PIPE

Pascale also testified about the sale of the third unit. The third unit was apparently transported to Guzzler's facility in Alabama at the same time as the other two units that were sold to Vac–Tech. Pascale stated that before any inspection or refurbishing was authorized, he received a call from Stafford asking if he would sell the unit for $58,000.00 and Pascale agreed. He stated that he was not certain who the buyer was. He said he intended to pay off Transamerica with the sale proceeds but he never received any proceeds from Guzzler.

Stafford testified that Guzzler was acting as a broker for the Debtor to sell the third unit to Ace Pipe. Exhibit 13 contained an inter-company message confirming the details of the transaction as follows:

> The unit was sold to Ace Pipe for $62,500.00. Of these proceeds, $4,500 was to be retained by Guzzler and the remaining $58,000.00 sent to National Hydro–Vac. However, with the status of National Hydro–Vac a memo from corporate was initiated which requested that the proceeds be applied to the outstanding invoices (which had previously been charged off in August) of National Hydro–Vac.

Plaintiff's Exhibit 13, Document 7, Message dated September 20, 2001.

Stafford identified the certificate of title to the third unit reflecting a lien in favor of Transamerica dated March 1, 2001. (Pl.'s Ex. 3.) Guzzler received $62,500.00 from Ace Pipe on December 26, 2000. Plaintiff's Exhibit 13 contains accounting records of Vactor (another subsidiary of Federal Signal that handles accounting for Guzzler). The exhibit shows receipt of $62,500.00 from Ace Pipe. The record reflects the proceeds were not paid to the Debtor but instead were applied to bad debt reserve in the amount of $19,210.00 and transferred intercompany in the amount of $43,290.00 to "Guzzler Federal Signal Leasing account for National Hydro-Vac's outstanding balances." (Pl.'s Ex. 13, document 7.) The disbursement was accomplished and noted on the company books on October 5, 2001. (See Pl.'s Ex. 13, document 9, October 4, 2001 memo from Gary Nink.)

Stafford acknowledged that the proceeds of the sale to Ace were disbursed between the two accounts in October 2001 and that the disbursement was made with knowledge of the pending bankruptcy case. Exhibit 10 contains a bill of sale evidencing the sale of the third unit from Guzzler to Ace on December 18, 2000, for $62,500.00. Stafford agreed that the third unit was sold to Ace before receipt of the bill of sale from the Debtor to Guzzler. (Tr. at 76.)

### ARGUMENTS

The Trustee argues that Guzzler is liable for the tort of conversion because the evidence shows that when Guzzler received funds from Vac–Tech, Guzzler did not immediately pay the Debtor. The Trustee reasons that, pursuant to state law, Guzzler is not entitled to setoff a debt against a judgment for conversion.

Second, the Trustee argues that when Guzzler received the proceeds from the sale of two units to Vac–Tech in June or July 2000, Guzzler's maximum right of setoff was $32,026.68. Third, the Trustee contends that the right of setoff does not exist because the debts were not mutual since some of the funds were transferred inter-company to Federal Signal, an entity that was not a creditor of the Debtor. The Trustee's fourth argument is that Guzzler was acting in a fiduciary capacity as agent of a principal, that it breached its duty by failing to turn over the sale proceeds from the sale of the units, and that damages of $282,500.00 resulted. Additionally, the Trustee asks for punitive damages to punish the Defendants for their actions.

The final argument is that the setoff of the proceeds from the sale of the third unit to Ace occurred post-petition in violation of sections 362 and 549 of the Bankruptcy Code and should be set aside as void. Because of the violation of the automatic stay, the Trustee contends that sanctions should be imposed on Guzzler.

Guzzler and Federal Signal argue that Guzzler had a right to set off the sums owed to the Debtor and that the Debtor has not been damaged by the setoff. While acknowledging that the setoff of the sale proceeds of the third unit to Ace may have violated the automatic stay, Guzzler states that it should now be permitted to accomplish the setoff.

The Defendant, Federal Signal, argues it should be dismissed from the lawsuit because all decisions were made by Guzzler. The Defendants also deny that they converted the Debtor's property and state that punitive damages are not justified and have been waived by the Debtor's invoking of the bankruptcy court's equitable jurisdiction.

As to the complaint in intervention, the Defendants argue that Transamerica pre-

sented no evidence of its security interest in the three units in question.

## TRANSAMERICA CLAIM

Transamerica alleges in its complaint in intervention that it held a perfected security interest and claims a lien in the three units. Brian DeRusha of Transamerica testified that Transamerica never received any funds from Guzzler and never released its lien in the three units.

Pascale testified that the Debtor purchased 80 units from the Freemeyer Company and Transamerica financed the entire purchase. The three units in question, all made by Guzzler, were part of the acquisition.

There was no other testimony concerning Transamerica's lien, and counsel makes no argument on behalf of Transamerica in his brief. Since Transamerica was secured by collateral in addition to the three units in question, the record in this case does not establish that the security interest in favor of Transamerica is supported by value as required by Arkansas law on secured transactions. *See* Ark.Code Ann. § 4–9–203(1)(b)(Michie Supp.1999). Therefore, Transamerica has not established it has a valid lien in the proceeds of the sale of the three units.

## CONVERSION

■ Under Arkansas law, conversion is any distinct act of dominion wrongfully exerted over property in denial of, or inconsistent with the owner's rights. *McQuillan v. Mercedes–Benz Credit Corp.*, 331 Ark. 242, 247, 961 S.W.2d 729, 732 (1998) (citing *South v. Smith*, 326 Ark. 774, 934 S.W.2d 503 (1996)) (citing *Dent v. Wright*, 322 Ark. 256, 909 S.W.2d 302 (1995)); *Reed v. Hamilton*, 315 Ark. 56, 864 S.W.2d 845 (1993); *Orsini v. Larry Moyer Trucking, Inc.*, 310 Ark. 179, 181, 839 S.W.2d 180, 184 (1992) (citing *Elliott v.*

*Hurst*, 307 Ark. 134, 817 S.W.2d 877 (1991)).

■ In defining conversion, the Arkansas Supreme Court has stated that

"The conversion may not be a manual taking *or for the defendant's use:* if the defendant exercises control over the goods in exclusion, or defiance, of the plaintiff's right, it is a conversion, *whether it is for his own use or another's use."* (Our italics). *Big A Warehouse Distributors, Inc. v. Rye Auto Supply, Inc.*, 19 Ark.App. 286, 719 S.W.2d 716 (1986). "Perhaps the most common way in which conversion is committed is by an unauthorized transfer or disposal of possession of the goods to one who is not entitled to them." Prosser and Keeton on the Law of Torts, 5th Edition § 15 p. 92.

*McKenzie v. Tom Gibson Ford, Inc.*, 295 Ark. 326, 329–30, 749 S.W.2d 653, 655 (1988).

■ Where a party exercises dominion over property in violation of the true owner's rights to possession, either actual or constructive dominion, a conversion occurs. *Holland v. Walls*, 3 Ark.App. 20, 24, 621 S.W.2d 496, 498 (1981)(citing *Plunkett–Jarrell Grocery Co. v. Terry*, 222 Ark. 784, 263 S.W.2d 229 (1953)). Conversion is a common law intentional tort action. *Buck v. Gillham*, 80 Ark.App. 375, 379, 96 S.W.3d 750, 753 (2003); *McQuillan*, 331 Ark. at 247, 961 S.W.2d at 732 (citing *France v. Nelson*, 292 Ark. 219, 729 S.W.2d 161 (1987); *Gardner v. Robinson*, 42 Ark.App. 90, 854 S.W.2d 356 (1993)).

■ A converter cannot escape liability even if the proceeds of the conversion are applied in a manner that may ultimately benefit the owner. *McKenzie*, 295 Ark. at 330, 749 S.W.2d at 656. Moreover, if there has been a wrongful taking of one's property in subversion of his rights, a con-

version occurs irrespective of whether there was a demand and refusal to return the property. *Ford Motor Credit Co. v. Herring,* 267 Ark. 201, 204, 589 S.W.2d 584, 586 (1979) (citing *Westark Prod. Credit Ass'n v. Shouse,* 227 Ark. 1141, 305 S.W.2d 127 (1957); *Plunkett–Jarrell Grocery Co. v. Terry,* 222 Ark. 784, 263 S.W.2d 229 (1953); *Meyers v. Meyers,* 214 Ark. 273, 216 S.W.2d 54 (1948); *Barnett Bros. Mercantile Co. v. Jarrett,* 133 Ark. 173, 202 S.W. 474 (1918)).

■ Generally, the proper measure of damage for conversion of property is the market value of the property at the time and place of the conversion. *Buck,* 80 Ark.App. at 379, 96 S.W.3d at 753; *McQuillan,* 331 Ark. at 250, 961 S.W.2d at 733 (citing *Elliott v. Hurst,* 307 Ark. 134, 817 S.W.2d 877 (1991); *Ford Motor Credit Co. v. Herring,* 267 Ark. 201, 589 S.W.2d 584 (1979)). Fair market value as a measure of damages for conversion is defined as the price the personalty would bring between a willing seller and a willing buyer in the open market after negotiations. *JAG Consulting v. Eubanks,* 77 Ark.App. 232, 238, 72 S.W.3d 549, 553 (2002) (citing *Minerva Enters., Inc. v. Howlett,* 308 Ark. 291, 824 S.W.2d 377 (1992); *Southern Bus. Co. v. Simpson,* 214 Ark. 323, 215 S.W.2d 699 (1948))..

### TWO UNITS SOLD TO VAC–TECH

■ Under these facts, the Trustee has failed to establish that Guzzler committed the tort of conversion of the two units sold to Vac–Tech. With reference to state law regarding the sale of goods, the term "goods" refers to all things which are moveable at the time of the identification to the contract. Ark.Code Ann. § 4–2–105(1)(Michie 1991). The two units sold to Vac–Tech qualify as "goods" under the statute.

A sale of goods occurs when title passes to the buyer "at the time and place at which the seller completes his performance with reference to the physical delivery of the goods ... even though a document of title is to be delivered at a different time or place:...." Ark.Code Ann. § 4–2–401(2)(Michie 1991); *American Aviation, Inc. v. Aviation Ins. Managers, Inc.,* 244 Ark. 829, 835, 427 S.W.2d 544, 547 (1968).

Where delivery is to be made without moving the goods, "if the goods are at the time of contracting already identified and no documents are to be delivered, title passes at the time and place of contracting." Ark.Code Ann § 4–2–401(b) (Michie 1991). Unless the buyer and seller have agreed otherwise, "payment is due at the time and place at which the buyer is to receive the goods...." Ark.Code Ann. § 4–2–310 (Michie 1991).

None of the documentary evidence or testimony indicates that the parties agreed upon when payment would be due from Guzzler. The Trustee argues that the Debtor's right to payment occurred when Guzzler received payment from Vac–Tech and that the Debtor should be granted judgment for the full price Guzzler received for the two units, or at least $75,000.00 each. The statute governing the sale of goods indicates that the Debtor's right to payment occurred even earlier. Since the goods were already in Guzzler's possession at the time of contracting in May or June of 2000, title passed to Guzzler and payment was due to the Debtor at the end of June at the very latest.

Guzzler acquired the possession of two units by agreement with the Debtor. At some time in May or June 2000, the parties agreed on a sale from the Debtor to Guzzler of both units for $75,000.00 each.[2] Guzzler's actions in re-selling the units to

---

**2.** The Court does not find credible Stafford's

testimony that the agreed price was

Vac–Tech were in reliance on that agreement and were consistent with the Debtor's ownership rights because the Debtor had agreed to transfer its ownership rights to Guzzler in exchange for payment of $75,000.00 for each unit. Stafford testified, "[W]e had made this original deal and we had gotten the okay to go ahead with the refurbishment from Mr. Pascale, and we were in the process of doing this." (Tr. at 80.)

The fact that a formal bill of sale was not signed until August 1, 2000, is immaterial. The two units, having already been delivered to Guzzler by the Debtor, were sold to Guzzler when the parties reached an agreement, and not when the bills of sale were executed. Guzzler's failure to pay the Debtor at the time of contracting should be viewed as a breach of a contract rather than as a conversion. The Debtor's remedy was to sue Guzzler under the contract. See Ark.Code Ann. § 4–2–709(1)(a) (Michie 1991) ("When the buyer fails to pay the price as it becomes due the seller may recover … the price … of goods accepted … ").

Also, there is no evidence in the record to support the Trustee's claim that the Debtor had any ownership interest in the funds Guzzler received from Vac–Tech.

### CONVERSION OF THIRD UNIT

■ However, the facts regarding the third unit sold to Ace clearly support the conclusion that Guzzler committed the tort of conversion. The third unit was sent to Guzzler for inspection and possible repair and refurbishing by agreement of the parties. Although Pascale did not remember if he was selling to Guzzler or someone else, both parties agreed that the Debtor was to receive $58,000.00.

Stafford recalled that Guzzler was acting as a broker for the sale and his testimony was corroborated by Gary Nink in an e-mail dated September 21, 2001, in which Guzzler was described as acting as a broker to assist the sale. (Pl.'s Ex. 13, Document 6.) The unit was sold to Ace Pipe for $62,500.00. It was anticipated that Guzzler would retain $4500.00 as a commission and the balance of $58,000.00 was to be remitted to the Debtor.

Under these facts, Guzzler was acting in the capacity of a broker for the Debtor, and when it received the sale proceeds from Ace on December 26, 2000, $58,000.00 of the proceeds belonged to the Debtor. Unlike the proceeds from the sale of the two units to Vac–Tech, the funds received from Ace were property of the Debtor, and Guzzler owed a fiduciary responsibility as the broker to remit the money to the Debtor. Here, Guzzler simply seized the Debtor's property and applied it to a debt without any legal right established by a lien or by virtue of judicial process.

Establishing the measure of damages for the conversion is simplified because of the parties' agreement that the Debtor would accept $58,000.00 for the unit and this amount was later disbursed to various accounts by Federal Signal and Guzzler. Therefore, the actual damages for conversion are fixed at $58,000.00. *See McQuillan*, 331 Ark. at 250, 961 S.W.2d at 733 (1998)(holding the proper measure of damages is the market value of the property at the time and place of the conversion).

### RIGHT TO SETOFF OF VAC–TECH UNITS

■ The Court has determined that Guzzler did not commit the tort of conver-

$65,000.00. The fact that Stafford testified that it was a business practice to overstate the consideration in the bill of sale in order to conceal the true price is reason enough to

find his testimony not worthy of belief. The Court credits Pascale's testimony that the agreed consideration was $75,000.00.

sion in regard to the two units sold to Vac–Tech. Instead of paying the Debtor the $150,000.00 it agreed to pay for the purchase of the equipment, Guzzler exercised its right of setoff pre-petition by crediting the Debtor's account in the sum of $130,000.00 in the latter part of 2000.

Aside from the definition of setoff as a type of counterclaim or affirmative defense applicable in court proceedings, the term also refers to the extrajudicial right of entities that owe each other money to apply their mutual debts against each other. Equitable setoff allows mutually indebted entities to avoid the "absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (quoting *Studley v. Boylston Nat'l Bank,* 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913)). The right of setoff entitles either party unilaterally to reduce the amount owed to the other party by the amount owed to the party exercising setoff.

With regard to the right of setoff, the Bankruptcy Code provides that

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case against a claim of such creditor against the debtor that arose before the commencement of the case . . . .

11 U.S.C. § 553(a) (2000).

■ This section does not create a right of setoff but merely preserves the right as it exists under non-bankruptcy law. *Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 18, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995).

■ In order for a setoff action to be valid under the Bankruptcy Code, four requirements must be met: The two debts must be mutual; the debt owing to the creditor must arise before the bankruptcy case; the claim against the creditor must arise before the bankruptcy case; and state law allows setoff under the circumstances. *River Valley Bank v. Ace Sports Management L.L.C. (In re Ace Sports Management, LLC),* 271 B.R. 134, 140–141 (Bankr.E.D.Ark.2001)(citing *Austin v. Cockings (In re Cockings),* 195 B.R. 915, 917 (Bankr.E.D.Ark.1996)(citing *In re Whitaker,* 173 B.R. 359, 361 (Bankr. S.D.Ohio 1994); *In re MetCo Mining & Minerals, Inc.,* 171 B.R. 210, 217 (Bankr. W.D.Pa.1994); *In re Glaze,* 169 B.R. 956, 964 (Bankr.D.Ariz.1994))).

Each of these elements existed at the time Guzzler credited the Debtor's account with the sale proceeds from Vac–Tech. The fact that the setoff was accomplished through inter-company transfer does not alter the fact that the setoff was proper. There is no evidence to contradict Guzzler's witness who stated that accounting functions by the subsidiary companies were performed on behalf of Guzzler.

Despite Guzzler's right to setoff, it remains indebted to the Debtor for $20,000.00, which is the difference between the amount of credit applied to the Debtor's accounts and the amount the Court has found was owing to the Debtor under the terms of the parties' agreement to sell the two units for $75,000.00 each. Guzzler has alleged a right of setoff in response to the Trustee's claim for turnover; however, Guzzler did not present a case in chief, and the record presented does not establish any current right of setoff with regard to the $20,000.00 not previously credited or paid to the Debtor.

There is evidence in the record that in January 2001, the Debtor was indebted to Guzzler for more than $1 million, but Guzzler had collateral for the debt, and the

record is silent as to whether the Debtor owed Guzzler any monies at the time of the hearing. Therefore, the Trustee is entitled to a judgment of turnover in the sum of $20,000.00, which represents the balance of the purchase price of the two units that was not previously applied to the Debtor's account with Guzzler.

## RIGHT OF SETOFF AS TO PROCEEDS OF THIRD UNIT

■ In addition to section 553 of the Bankruptcy Code, provisions dealing with the automatic stay govern the exercise of the right of setoff. In relevant part, the Code states that "Except as provided in subsection (b) ... a petition filed under section 301, 302 or 303 of this title ... operates as a stay, applicable to all entities, of—... (7) the set off of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor...." 11 U.S.C. § 362(a)(7) (2000). The stay also applies to any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate. 11 U.S.C. § 362(a)(3) (2000).

A majority of jurisdictions addressing the issue have found that a setoff has occurred when three steps have been taken. These include "(i) a decision to effectuate a setoff, (ii) some action accomplishing the setoff, and (iii) a recording of the setoff." *Strumpf,* 516 U.S. at 19, 116 S.Ct. 286 (citing *Baker v. Nat'l City Bank of Cleveland,* 511 F.2d 1016, 1018 (6th Cir. 1975); *Normand Josef Enters., Inc. v. Connecticut Nat'l Bank,* 230 Conn. 486, 504–505, 646 A.2d 1289, 1299 (1994)).

■ Even if setoff is authorized under the Code provisions, the Bankruptcy Court has discretion to deny setoff when principles of equity so dictate. *In re Stienes,*

285 B.R. 360, 363 (Bankr.D.N.J.2002) (stating that setoff may be denied if the creditor acted inequitably where setoff would result in either a preference or priority over other unsecured creditors)(quoting *In re Lykes Bros., S.S. Co.,* 217 B.R. 304, 313 (Bankr.M.D.Fla.1997)); *In re Ace Sports Management, L.L.C.,* 271 B.R. at 143 (citations omitted).

Guzzler argues that it has the right of setoff in this action even if it is liable for damages of $58,000.00 for the tort of conversion because of an Arkansas statute permitting setoff under these circumstances. Guzzler contends that the Debtor was indebted to Guzzler for that amount; therefore, the Trustee should receive nothing upon his complaint. However, Guzzler's argument that it should be entitled to a setoff for the exact amount of the Trustee's damages for conversion must fail for several reasons.

■ The statute upon which Guzzler relies states "a setoff may be *pleaded* in any action for the recovery of money and may be a cause of action arising either upon contract or tort." Ark.Code Ann. § 16–63–206(a) (Michie 1987) (emphasis added). The Court views this provision as a procedural rule allowing for the pleading of setoff in certain actions for the recovery of money. The provision does not provide defendants with a substantive right to set off their claims against damages awarded against them because the right of setoff, once pleaded, would remain an issue for the court to decide on the merits.

■ Moreover, under Arkansas law, setoff is not permitted against a judgment for damages for conversion. *Ouachita Valley Refining Co. v. Webster,* 178 Ark. 845, 12 S.W.2d 779, 780 (1929); *Henderson Co. v. Webster,* 178 Ark. 553, 11 S.W.2d 463, 465 (1928). Referring to a precursor

of the statute upon which Guzzler relies, the Arkansas Supreme Court explained:

> But we held that the statute "does not authorize one who has sold goods to a person to go to the place of business of the buyer and retake the property which has been delivered, and then, when sued for the value of the property, so retaken, set off debts due to an action of this kind."

*Ouachita Valley*, 178 Ark. 845, 12 S.W.2d at 780 (quoting *Henderson*, 178 Ark. 553, 11 S.W.2d at 465).

Second, the debts in question are not mutual in the sense that they are owed in the same capacity. Serving as broker for the transaction between the Debtor and Ace, Guzzler owed the Debtor an obligation to return property Guzzler was holding in trust as an agent. By contrast, the debt owed by the Debtor to Guzzler was a simple account due and payable. *See, e.g., In re Drexel Burnham Lambert Group, Inc.*, 113 B.R. 830, 847–48 (Bankr. S.D.N.Y.1990) (stating that if creditor's debt arose from fiduciary duty or was in the nature of a trust, creditor could not setoff his claim against a debtor's obligation to creditor because of lack of mutuality). *Cf. Adams v. Resolution Trust Corp.*, 927 F.2d 348, 354 n. 14 (8th Cir. 1991) (stating that purchasers' subordinated debentures did not exist in the same right as promissory notes and could not be set off because of lack of mutuality).

Third, the right of setoff should not be permitted in this case upon equitable grounds. With knowledge of the pending bankruptcy case, Guzzler retained the Debtor's property and accomplished the setoff after the Debtor was in bankruptcy. The Court can only conclude from the evidence that this was a willful violation of the automatic stay. *See* 11 U.S.C. § 362(3) & (7) (2000). Guzzler's actions also implicate section 549 of the Code, which permits a trustee to avoid unauthorized post petition transfers.

By seizing the Debtor's property without legal right to do so, Guzzler has attempted to convert its claim into a fully secured claim to the prejudice of other unsecured creditors in the case. *See Federal Deposit Ins. Corp. v. Liberty Nat'l Bank*, 806 F.2d 961, 969 (10th Cir.1986) (recognizing that setoff in insolvency cases gives secured status to an otherwise unsecured creditor to the extent of the creditor's indebtedness to the insolvent); *In re Bourne*, 262 B.R. 745, 751 (Bankr. E.D.Tenn.2001) (stating that section 506 of the Code provides that a creditor has a secured claim to the extent of the offset).

If Guzzler is allowed a setoff, all creditors would be encouraged to seize an insolvent's property without process or claim of lien and then claim right of setoff when sued by the trustee for conversion. Such a result is contrary to the general policy of bankruptcy law of equality of distribution. Therefore, Guzzler is not entitled to exercise any right of setoff against the Trustee's judgment for conversion.

### PUNITIVE DAMAGES

 The Trustee seeks an award of punitive damages and attorney's fees in addition to the award of actual damages. Arkansas law authorizes an award of punitive damages for conversion. *Dees v. Allied Fidelity Ins. Co.*, 655 F.Supp. 10, 12 (E.D.Ark.1985); *McKenzie*, 295 Ark. at 331, 749 S.W.2d at 656; *Williams v. O'Neal Ford, Inc.*, 282 Ark. 362, 365, 668 S.W.2d 545, 546 (1984); *Herring*, 267 Ark. at 206–207, 589 S.W.2d at 588.

 Punitive damages are not recoverable in a conversion action simply because the defendant intentionally exercised control or dominion over the plaintiff's property. *City Nat'l Bank of Fort Smith v.*

*Goodwin,* 301 Ark. 182, 188, 783 S.W.2d 335, 338 (1990). The act of conversion will support an award for punitive damages only if the plaintiff can show that the defendant intentionally exercised control or dominion over the plaintiff's property for the purpose of violating his right to the property or for the purpose of causing damages. *City Nat'l Bank,* 301 Ark. at 188, 783 S.W.2d at 338(citing *Walt Bennett Ford, Inc. v. Keck,* 298 Ark. 424, 768 S.W.2d 28 (1989); *McKenzie v. Tom Gibson Ford, Inc.,* 295 Ark. 326, 749 S.W.2d 653 (1988); *Ford Motor Credit v. Herring,* 267 Ark. 201, 589 S.W.2d 584 (1979)).

▆▆▆▆ Punitive damages penalize conduct that is malicious or done with deliberate intent to injure. *Brown v. Blake,* No. CA 03–828, —— Ark.App. ——, ——, —— S.W.2d ——, ——, 2004 WL 897060, at *3 (2004)(citing *Routh Wrecker Serv., Inc. v. Washington,* 335 Ark. 232, 980 S.W.2d 240 (1998)). Malice is defined not as hatred, but as an intent or disposition to do a wrongful act greatly injurious to another. *Brown,* —— Ark.App. at ——, —— S.W.2d at ——, 2004 WL 897060, at *4. The relationship of the parties and the extent and duration of dominion are elements to consider in awarding punitive damages for conversion. *Walt Bennett Ford, Inc. v. Keck,* 298 Ark. 424, 429, 768 S.W.2d 28, 31 (1989).

▆▆▆▆ Guzzler argues that punitive damages are not allowable because proceedings in bankruptcy are equitable in nature. *See Pepper v. Litton,* 308 U.S. 295, 303–304, 60 S.Ct. 238, 84 L.Ed. 281 (1939) (holding that "for many purposes" bankruptcy courts are courts of equity). However, the bankruptcy court also exercises jurisdiction over some matters that are in the nature of legal rather than equitable

proceedings. *See Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 43, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (stating that "In England, long prior to the enactment of our first Judiciary Act, common law actions of trover . . . were resorted to for the recovery of preferential payments by bankrupts"). Here, the trustee has properly proceeded against the defendant under a theory of conversion, formerly trover, which is a legal, not equitable, cause of action that is cognizable in state circuit courts. *Buck,* 80 Ark.App. at 381, 96 S.W.3d at 754.

▆▆▆▆ Under the facts presented, the Trustee is entitled to punitive damages. Guzzler acted with complete indifference to the Debtor's ownership rights when it seized the Debtor's $58,000.00 and applied it to past due accounts. At the time of the seizure, Guzzler held no lien nor had judicial process issued. Moreover, Guzzler was aware of the Debtor's bankruptcy filing and knew or should have known that the automatic stay prevented Guzzler from enforcing its right of setoff. Under these circumstances, where Guzzler had no valid right to the funds under either state or federal law, the Court infers that Guzzler converted the Debtor's property for the purpose of violating the Debtor's property rights.

▆▆▆▆ More than two years later Guzzler still retains the Debtor's property without any legal basis to do so. These actions were also taken in violation of Guzzler's duties as a fiduciary while acting in a position of trust as broker for the Debtor. The extent and duration of control over the Debtor's property that were exercised by Guzzler and Guzzler's fiduciary relationship with the Debtor dictate that punitive damages must be assessed.[3]

---

3. Under the Bankruptcy Code, even if Guzzler had a valid right of setoff with regard to the

$58,000.00, Guzzler would not be permitted to exercise that right without first applying

██ Punitive damages should be awarded pursuant to some rational basis. The sum awarded should be sufficient to deter future misconduct. *First Nat'l Bank of Brinkley v. Frey*, 282 Ark. 339, 343, 668 S.W.2d 533, 536 (1984) (opining that penalty of punitive damages must be in an amount sufficient to deter defendant from similar conduct) (citing *Ray Dodge, Inc. v. Moore*, 251 Ark. 1036, 479 S.W.2d 518 (1972); *Holmes v. Hollingsworth*, 234 Ark. 347, 352 S.W.2d 96 (1961)).

Guzzler was entitled to a fee of $4500.00 as compensation for its services under the agreement with the Debtor. Therefore, the Court fixes punitive damages at three times the commission charged by Guzzler, a sum equal to $13,500.00.

██ The Trustee is also entitled to an award of pre-judgment interest on the sum of $58,000.00 from the date of conversion, which is the date when the setoff was accomplished, October 5, 2001, until the date of the entry of this judgment. See *Fitzgerald v. Investors Preferred Life Ins. Co.*, 258 Ark. 966, 968, 530 S.W.2d 195, 197 (1975) (stating that interest on a judgment award for a willful conversion runs from the date of conversion)(citing *Bradley Lumber Co. v. Hamilton*, 117 Ark. 127, 173 S.W. 848 (1915)).

### ATTORNEY'S FEES

██ The Trustee seeks an award of attorney's fees for bringing this action. Attorney's fees are not authorized by state law to the prevailing party in an action for conversion. *McQuillan*, 331 Ark. at 250, 961 S.W.2d at 734 (distinguishing between non-compensable legal expenses in prosecuting a conversion action and compensable legal expenses incurred to recover pos-

session of converted property) (citing *Fulks v. Fulks*, 95 Ohio App. 515, 121 N.E.2d 180 (1953); *Cincinnati Ins. Co. v. Diebold, Inc.*, 64 Ohio App.3d 273, 581 N.E.2d 566 (1989)).

Notwithstanding that the Trustee did not sue under a breach of contract theory, the Court has held under these facts that the Trustee is entitled to recover $20,000.00 because of Guzzler's breach of contract. The issue of whether attorney's fees would be allowed in this context was not addressed by the parties. Therefore, within 20 days of the entry of this judgment, the Trustee may petition the Court for attorney's fees related to the award of $20,000.00 for breach of contract.

### SUMMARY

For the reasons stated herein, the Trustee is entitled to judgment against Guzzler and Federal Signal, jointly and severally, for the sum of $58,000.00 plus interest at the legal rate from October 5, 2001, until the date of the entry of the judgment; judgment for the sum of $20,000.00 plus interest at the legal rate from July 1, 2000, when payment was due to the Debtor, until the date of the entry of the judgment; judgment for punitive damages of $13,500.00 and costs of this action. The judgment shall bear interest at the legal rate from the date of entry of the judgment until satisfied.

IT IS SO ORDERED.

---

for relief from stay. *In re Stienes*, 285 B.R. at 362. However, the Court acknowledges that even though Guzzler willfully violated the automatic stay, the Debtor is not entitled to punitive damages under section 362(h) of the Bankruptcy Code because the Debtor is a corporation rather than an individual.